# EXHIBIT A

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

JULY 2026 02609

E-Filing Number: 2607052251

| | |
|---|---|
| PLAINTIFF'S NAME<br>THOMAS JEFFERSON UNIVERSITY | DEFENDANT'S NAME<br>KEYSTONE HEALTH PLAN EAST |
| PLAINTIFF'S ADDRESS<br>1020 WALNUT ST<br>PHILADELPHIA PA 19107 | DEFENDANT'S ADDRESS<br>1901 MARKET STREET 28TH FLOOR<br>PHILADELPHIA PA 19103 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>QCC INSURANCE COMPANY |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>1901 MARKET STREET 28TH FLOOR<br>PHILADELPHIA PA 19103 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>AMERIHEALTH HMO |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>1901 MARKET STREET 28TH FLOOR<br>PHILADELPHIA PA 19103 |

TOTAL NUMBER OF PLAINTIFFS: 1

TOTAL NUMBER OF DEFENDANTS: 3

COMMENCEMENT OF ACTION
- [X] Complaint
- [ ] Petition Action
- [ ] Notice of Appeal
- [ ] Writ of Summons
- [ ] Transfer From Other Jurisdictions

AMOUNT IN CONTROVERSY
- [ ] $50,000.00 or less
- [X] More than $50,000.00

COURT PROGRAMS
- [ ] Arbitration
- [X] Jury
- [ ] Non-Jury
- [ ] Other:
- [ ] Mass Tort
- [ ] Savings Action
- [ ] Petition
- [ ] Commerce
- [ ] Minor Court Appeal
- [ ] Statutory Appeals
- [ ] Settlement
- [ ] Minors
- [ ] W/D/Survival

CASE TYPE AND CODE
1O - CONTRACTS OTHER

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

FILED
PRO PROTHY
JUL 22 2026
B. BALILONIS

IS CASE SUBJECT TO COORDINATION ORDER?
YES NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: THOMAS JEFFERSON UNIVERSITY

Papers may be served at the address set forth below.

| | |
|---|---|
| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>AARON KRAUSS | ADDRESS<br>COZEN O'CONNOR<br>1650 MARKET STREET<br>PHILADELPHIA PA 19103 |
| PHONE NUMBER<br>(215)665-4181<br>FAX NUMBER<br>(215)701-2381 | |
| SUPREME COURT IDENTIFICATION NO.<br>62419 | E-MAIL ADDRESS<br>akrauss@cozen.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*AARON KRAUSS* | DATE SUBMITTED<br>Wednesday, July 22, 2026, 04:06 pm |

Filed and Attested by the Office of Judicial Records 22 JUL 2026 04:06 pm B. BALILONIS

# COMMERCE PROGRAM ADDENDUM TO CIVIL COVER SHEET

This case *is* subject to the Commerce Program because it is not an arbitration matter ai more ot the following types (check all applicable):

__ 1. Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

_X_ 2. Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

- __ a. Uniform Commercial Code transactions;
- __ b. Purchases or sales of business or the assets of businesses;
- __ c. Sales of goods or services by or to business enterprises;
- __ d. Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;
- __ e. Surety bonds;
- __ f. Purchases or sales or leases of, or security interests in, commercial, real or personal property; and
- __ g. Franchisor/franchisee relationships.

__ 3. Actions relating to trade secret or non-compete agreements;

__ 4. "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

__ 5. Actions relating to intellectual property disputes;

__ 6. Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

__ 7. Derivative actions and class actions based on claims otherwise falling within these ten types, and consumer class actions other than personal injury and products liability claims;

__ 8. Actions relating to corporate trust affairs;

__ 9. Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Commercial General Liability policy;

__ 10. Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

*Instructions:* Please see Commerce Case Management Program: Procedure for Disposition of Commerce Program Cases Filed On and After January 1, 2000. Arbitration matters are not subject to the Commerce Program. Note that the following types of matters are **not** to be included in the Commerce Program:

1. Matters subject to Compulsory Arbitration in this Court or to the jurisdiction of the Municipal Court, including any appeals.

2. Personal injury, survival or wrongful death matters.

3. Individual (non-class) consumer claims against businesses or insurers, including products liability and personal injury cases.

4. Matters involving occupational health or safety.

5. Environmental claims not involved in the sale or disposition of a business and other than those addressed in Commerce Program types 9 or 10 above.

6. Matters in eminent domain.

7. Malpractice claims, other than those brought by business enterprises against attorneys, or accountants, architects or other professionals in connection with the rendering of professional services to the business enterprise.

8. Employment law cases, other than those referenced in Commerce Program type 3 above.

9. Administrative agency, tax, zoning and other appeals.

10. Petition Actions in the nature of Change of Name, Mental Health Act Petitions, Petitions to Appoint an Arbitrator, Government Election Matters, Leave to Issue Subpoena, Compel Medical Examination.

11. Individual residential real estate and non-commercial landlord-tenant disputes.

12. Domestic relations matters, and actions relating to distribution of marital property, custody or support.

13. Any matter required by statute, including 20 Pa. C.S. Chapter 7, §§ 711 & 713, to be heard in the Orphans' Court or Family Court Division of the Philadelphia Court of Common Pleas, or other matter which has heretofore been within the jurisdiction of the Orphans' Court or Family Court Division of this Court.

14. Any criminal matter other than criminal contempt in connection with a Commerce Program action.

15. Such other matters as the Court shall determine.

Filed and Attested by the
Office of Judicial Records
22 JUL 2026 04:06 pm
B. BALILONIS

Aaron Krauss (62419)
R. Christopher Raphaely (59093)
Danielle E. Sapega (311561)
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4181
akrauss@cozen.com
craphaely@cozen.com
dsapega@cozen.com
Attorneys for Thomas Jefferson University

**IN THE COURT OF COMMON PLEAS
OF AND FOR PHILADELPHIA COUNTY**

| | |
|---|---|
| THOMAS JEFFERSON UNIVERSITY<br>d/b/a JEFFERSON HEALTH,<br>1101 Market Street<br>Philadelphia, PA 19107,<br><br>Plaintiff,<br><br>v.<br><br>KEYSTONE HEALTH PLAN EAST,<br>1901 Market Street, 28th Floor<br>Philadelphia, PA 19103,<br><br>QCC INSURANCE COMPANY,<br>1901 Market Street, 28th Floor<br>Philadelphia, PA 19103,<br><br>AMERIHEALTH HMO,<br>1901 Market Street, 28th Floor<br>Philadelphia, PA 19103,<br><br>Defendants. | July Term 2026<br>Civil Action No.<br><br>JURY TRIAL DEMANDED |

**NOTICE TO DEFEND**

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*<br><br>**Philadelphia Bar Association Lawyer Referral and Information Service<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197** | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*<br><br>**Asociacion De Licenciados De Filadelfia<br>Servicio De Referencia E Informacion Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>(215) 238-6333<br>TTY (215) 451-6197** |

Aaron Krauss (62419)
R. Christopher Raphaely (59093)
Danielle E. Sapega (311561)
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4181
akrauss@cozen.com
craphaely@cozen.com
dsapega@cozen.com
Attorneys for Thomas Jefferson University

**IN THE COURT OF COMMON PLEAS**
**OF AND FOR PHILADELPHIA COUNTY**

| | |
|---|---|
| THOMAS JEFFERSON UNIVERSITY<br>d/b/a JEFFERSON HEALTH,<br>1101 Market Street<br>Philadelphia, PA 19107,<br><br>Plaintiff,<br><br>v.<br><br>KEYSTONE HEALTH PLAN EAST,<br>1901 Market Street, 28th Floor<br>Philadelphia, PA 19103,<br><br>QCC INSURANCE COMPANY,<br>1901 Market Street, 28th Floor<br>Philadelphia, PA 19103,<br><br>AMERIHEALTH HMO,<br>1901 Market Street, 28th Floor<br>Philadelphia, PA 19103,<br><br>Defendants. | July Term 2026<br>Civil Action No.<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Keystone Health Plan East, QCC Insurance Company and AmeriHealth HMO (collectively Independence Blue Cross, or IBC) entered into a contract with Thomas Jefferson University under which IBC would pay for medical services Jefferson provided to IBC's



Case ID: 2607026

insureds. See Exhibit 1; Exhibit 2.[1] Jefferson has performed under the contracts, and has treated in excess of 312,000 of IBC's insureds in 2025 alone. IBC, however, has breached the contracts in at least five ways. First, even though Federal Law generally requires IBC to provide and pay for coverage on an inpatient (rather than an observation) basis when a treating physician expects one of IBC's insureds to stay in a hospital for medically necessary treatment across two midnights, IBC has unilaterally decided that, if one if its insureds is in the hospital across five or fewer midnights, and IBC (in its sole discretion using tools that the Federal Government does not allow insurers to use to deny coverage) decides that its insured's medical condition wasn't "severe" (even though it was severe enough to require a five-day hospital stay), IBC will only pay for observation. Second, IBC is also denying coverage for some of its insureds whose hospital stay is expected to cross (and in fact does cross) more than two midnights. Third, IBC unilaterally decided that, if one of its insureds was readmitted to any hospital (either as an inpatient or for observation) within thirty days of being discharged, IBC would not pay. Fourth, IBC unilaterally decided that it would only pay for a long list of procedures if they were conducted in an ambulatory surgery center, rather than in a hospital facility. Fifth, even though the United States Supreme Court ruled that it was illegal for Medicare to pay 22.5% less than the average sales price (rather than 6% more than the average sales price) for drugs under Section 340B, and even though the Centers for Medicare & Medicaid Services (CMS) promulgated a final rule saying that Section 340B drug pricing was to be adjusted to "make up the difference" between the "negative 22.5%" that was paid and the "positive 6%" that should have been paid,

---

[1] Given the confidentiality provisions in the contract, see Exhibit 1 § 10, Jefferson is not attaching Exhibit 1 or Exhibit 2 to the complaint. It will, however, supply additional copies to IBC (which already has copies because it is the contractual counterparty), and will supply copies to the Court for *in camera* review, if requested. To the extent IBC demands that the contracts be attached to the complaint, Jefferson will seek to file them under seal. See Exhibit 1 § 10.4(a).



Case ID: 2607026

IBC has refused to do so. The cumulative impact of these breaches on Jefferson approaches $100 million. These breaches are emblematic of IBC's systemic effort to unilaterally reduce Jefferson's compensation levels well below what the parties agreed to when they signed the Agreement, and to deprive Jefferson of the full value of the Agreement it negotiated with IBC. Jefferson therefore sues IBC for breaching its contracts, and in support thereof avers as follows:

1. Thomas Jefferson University is a university and medical center that does business as Thomas Jefferson Health. Jefferson's principal place of business is located at 1101 Market Street, Philadelphia, PA 19107.

2. Jefferson owns and operates 33 hospitals and over 700 healthcare sites.

3. Keystone Health Plan East, QCC Insurance Company and AmeriHealth HMO are all related insurance companies that collectively operate as Independence Blue Cross, or IBC. IBC's principal place of business is located at 1901 Market Street, Philadelphia, PA 19103.

4. IBC insures more than 3 million people, more than two million of whom live in the Philadelphia area.

5. IBC is a licensee of the Blue Cross and Blue Shield Association.

6. This Court has subject matter jurisdiction over this lawsuit pursuant to 42 Pa. C.S.A. § 931(a), and has personal jurisdiction over IBC pursuant to 42 Pa. C.S.A. § 5301(a).

7. Venue is proper in this jurisdiction pursuant to Pennsylvania Rules of Civil Procedure 1006 and 2179, *inter alia*, because the cause of action arose, and a transaction or occurrence took place out of which the cause of action arose, in Philadelphia County.



Case ID: 2607026

## RELEVANT CONTRACTUAL PROVISIONS

8. Jefferson and IBC entered into a contract effective as of September 1, 2017. See Exhibit 1.

9. Jefferson and IBC amended their contract, effective as of January 1, 2023. See Exhibit 2.

10. Jefferson and IBC's amended contract "automatically terminates on December 31, 2026, subject to earlier termination as otherwise provided in section 16 therein." See Exhibit 2 at § 1.

11. Except as specifically set forth in the amendment, the September 1, 2017 contract remained (and remains) in effect. See Exhibit 2 § 8(b).

12. The contract defines an "admission" to the hospital as "the admission of a Member to Hospital for Inpatient Services with the intention that the Member remain in the Hospital overnight or for a period of twenty-four (24) hours or more for the provision of acute care Covered Services." See Exhibit 1 § 1.1.

13. IBC must pay for inpatient services at the rates set forth in the schedules attached to Exhibit A-1 of the contract. See Exhibit 1 at Exhibit A-1 § 2.1.

14. The contract defines "observation services" as "Covered Services which are short-term therapeutic, monitoring and assessment services provided to evaluate an outpatient condition or determine the need for an Admission." See Exhibit 1 § 1.27.

15. The contract defines "outpatient services" as "Services which are diagnostic, therapeutic or surgical services provided other than pursuant to an Admission." See Exhibit 1 § 1.28.



Case ID: 2607026

16. IBC must pay for outpatient services at the percentages of the fee schedules attached to Exhibit A-1 of the contract. See Exhibit 1 at Exhibit A-1 § 3.2.

17. If IBC changes its outpatient fee schedule, IBC's doing so cannot materially affect the total amounts payable under the contract. See Exhibit 1 at Exhibit A-1 § 4.1.

18. As a general matter, IBC (and all insurers) pay more for inpatient services than they do for either observation or outpatient services.

19. The contract provides that, to the extent the terms of IBC's hospital manual conflict with the contract, the contract controls. See Exhibit 1 § 2.1.

20. The contract requires IBC to pay Jefferson for covered services that Jefferson provides to IBC's insureds. See Exhibit 1 § 3.1.

21. The contract provides that Jefferson's charges for services provided to IBC's insureds will be the same as Jefferson's charges to other patients for the same services. See Exhibit 1 § 3.3.

22. The contract requires IBC to pay "clean claims" within thirty days. See Exhibit 1 § 3.9.

23. The contract provides that IBC may make "retroactive claim payment adjustments to correct" "underpayments" "or otherwise incorrect" payments. See Exhibit 1 § 3.10(b).

24. Although the contract gives IBC the right to change its procedures or its hospital manual, see Exhibit 1 § 19.1, if such a change decreases Jefferson's revenue under the contract by more than $1.25 million, the parties must renegotiate the payment terms of the contract. See Exhibit 1 § 19.2.



Case ID: 2607026

25. Although IBC can change its procedures or its hospital manual, see Exhibit 1 § 19.1, those changes cannot abrogate the contract.

26. For example, IBC cannot change its "policies" or its hospital manual to say that, from this day forward, IBC only pays $1 for heart transplant operations.

27. Not only would doing so contradict portions of the contract (i.e. the fee schedules), doing so would violate the duty of good faith and fair dealing that is implied into every contract.

28. IBC has attempted to use policy changes to – over time – attempt to re-write the contract.

29. Over time, IBC has changed its policies in ways that, on a cumulative basis, deprive Jefferson of the benefits (and the revenue) it expected to receive when it signed the contract.

30. It is fundamentally unfair for IBC to attempt to (and in fact to) change the contract by changing its policies.

31. The contract can only be amended by a writing signed by both Jefferson and IBC. See Exhibit 1 § 21.1.

32. Provisions of the contract can only be waived in writing. See Exhibit 1 § 21.5.

33. The waiver of one breach does not operate as a waiver of any other breach. See Exhibit 1 § 21.5.

34. The contract is integrated. See Exhibit 1 § 21.8.

35. The contract is governed by Pennsylvania law. See Exhibit 1 § 21.10.



Case ID: 2607026

36. Any court of competent jurisdiction can resolve any disputes arising out of the contract. See Exhibit 1 § 21.13.

**Facts Relevant To IBC's Imposition Of Its "Severity Policy"**

37. On March 5, 2026, IBC promulgated its claim payment policy bulletin MA00.059. See Exhibit 3.

38. This "severity policy" purports to apply to "emergent inpatient admissions, up to and including inpatient day five." See Exhibit 3.

39. This severity policy applies to IBC's Medicare Advantage products. See Exhibit 3.

40. Under the "Two Midnight Rule," see 42 C.F.R. § 412.3, any admission in which the patient is expected to remain in the hospital across two midnights is generally inpatient.

41. Under the Two Midnight Rule, "an inpatient admission is generally appropriate for ***payment*** under Medicare Part A when the admitting physician expects the patient to require hospital care that crosses two midnights." 42 C.F.R. § 412.3(d)(1) (emphasis added).

42. The Two Midnight Rule does not speak in terms of "severity," nor does it provide a two-tier structure for coverage of inpatient admissions.

43. Instead, the Two Midnight Rule provides a bright line test based on the expectation of the physician that the patient requires hospital care that crosses two midnights. See 42 C.F.R. § 412.3.



Case ID: 2607026

44. When it promulgated Section 412.3, CMS[2] explained in the Federal Register that the Two Midnight Rule sought to clarify the distinction between inpatient and observation for the Medicare program, to "reduce uncertainty regarding the requirements for ***payments*** to hospitals and [critical access hospitals] ***under Medicare Part A*** related to when a Medicare beneficiary should be admitted as a hospital inpatient, in this final rule." 78 Fed. Reg. at 50,506 (emphasis added). CMS had previously explained that Section 412.3 was adopted to avoid uncertainty and variation in reimbursement decisions that had arisen under its prior policy for evaluating the reasonableness of inpatient admissions. See 78 Fed. Reg. 27,486, 27,648 (May 10, 2013).

45. Medicare Advantage plans (i.e., Medicare managed care plans offered by private Medicare Advantage Organizations such as IBC to individuals who elect Medicare Part C) must provide no less coverage to Medicare Advantage beneficiaries than traditional Medicare. See Social Security Act § 1852, 42 U.S.C. § 1395w-22 (1997).

46. On April 12, 2023, CMS reaffirmed, in the Federal Register, what CMS explained to be "its longstanding policy that MA organizations may only apply coverage criteria that are no more restrictive than Traditional Medicare coverage criteria . . . ." 88 Fed. Reg. 22120, at 22189 (April 12, 2023).

47. Medicare Advantage plans, such as the ones offered by IBC, must provide that coverage through payment for covered services. See 42 C.F.R. § 422.101.

48. As a result, IBC must (under both the contract and the law) pay for inpatient admission when the Two Midnight Rule is satisfied.

---

[2] CMS is the Centers for Medicare & Medicaid Services, the agency within the Department of Health and Human services that (among other things) administers Medicare and sets the rules for Medicare Advantage plans. See, e.g., https://www.cms.gov/about-cms.



Case ID: 2607026

49. Specifically, CMS has stated that a "MA plan must provide coverage, by furnishing, arranging or, or paying for an inpatient admission when, based on consideration of complex medical factors documented in the medical record, the admitting physician expects the patient to require hospital care that crosses two-midnights. . . ." 88 Fed. Reg. 22120, at 22191 (April 12, 2023).

50. Under IBC's severity policy, IBC applies InterQual criteria. See Exhibit 3.

51. Insurers are generally not permitted to use InterQual criteria to make a determination as to whether a service is inpatient or observation. See 88 Fed. Reg. 22120, at 22194.

52. Specifically, CMS stated: "MA plans may not use InterQual or MCG criteria, or similar products, to change coverage or payment criteria already established under Traditional Medicare laws." 88 Fed. Reg. 22120, at 22194.

53. CMS further stated that "payment criteria for inpatient admissions at 42 CFR 412.3" (also known as the Two Midnight Rule) is a "general coverage and benefit condition[] included in Traditional Medicare laws." 88 Fed. Reg. 22120, at 22194.

54. IBC admits that, under its severity policy, the claim in question is covered as an inpatient claim. See Exhibit 3.

55. Despite admitting that the claims at issue are covered as inpatient claims, IBC's severity policy is to pay the provider for an observation claim if the IBC applied InterQual criteria doesn't think that the claim is severe enough. See Exhibit 3.

56. Under its severity policy, IBC assures its Medicare Advantage members (and its primary regulator in the Medicare Advantage Program, CMS) that it is "covering" the



Case ID: 2607026

inpatient admission to satisfy its contractual and regulatory commitments to its members and CMS, while simultaneously ignoring Jefferson's contract by paying Jefferson a rate, not for the services that the patient actually received and for which the patient was covered, but instead for outpatient observation care simply because doing so saves IBC money.

57. CMS has explained that "[w]hen determining whether Traditional Medicare criteria apply in MA, it is irrelevant whether Traditional Medicare considers the criteria part of a coverage rule or a payment rule, as both address the scope of items and services for which benefits are available to Medicare beneficiaries under Parts A and B." 88 Fed. Reg. 22120, at 22191-92 (April 12, 2023).

58. Jefferson's contract with IBC provides one rate for inpatient services, not two rates from which IBC gets to choose, depending on IBC's judgment as to the level of severity.

59. Significantly, IBC admits that, if the claim involves one of "CMS inpatient-only procedures," IBC cannot (and will not) use the InterQual criteria, and cannot (and will not) pay the claim as observation. See Exhibit 3.

60. IBC's severity policy is a breach of contract.

61. IBC's severity policy is a breach of the duty of good faith and fair dealing that is implied into every contract.

62. In addition to being a breach of contract, IBC's severity policy places additional burdens on Jefferson.

63. An administrative burden results from Jefferson's utilization management teams having to constantly provide updated clinical information to IBC and closely following IBC's determinations in order to challenge them, and the appeals teams having to continually



Case ID: 2607026

appeal IBC's determinations that the lower level of severity payment rate applies and following up on those appeals.

64. In addition, in phone call discussions between Jefferson's physician advisors and IBC's medical directors, which occur when Jefferson challenges IBC's "lower severity" determination, IBC requires Jefferson's physician advisors to go through the InterQual criteria and "check the box" to determine whether InterQual criteria are met. This process makes discussions much longer and more cumbersome and diverts the physicians' attention away from other matters that require their close attention.

65. Application of IBC's severity policy has also had downstream effects that penalize Jefferson for subsequent inpatient readmissions when IBC pays for them at the lower level of severity level. Because IBC is not technically "denying" the first inpatient stay, IBC treats subsequent inpatient stays as inappropriate "readmissions," which results in reduced reimbursement to Jefferson and places the burden on Jefferson to appeal and contest these cases.

66. The implementation of IBC's severity policy has made it extraordinarily burdensome and futile for Jefferson to try to address the underpayments through the normal course of appeals. Each follow up action on submitted appeals creates additional work and burden on Jefferson's staff.

67. IBC's severity policy is also highly likely to cause patient confusion and frustration directed toward Jefferson.

68. Jefferson's general practice is to wait to bill patients for their deductibles or co-pays when the accounts are in the appeals process, because the ultimate determination may impact the amounts owed by the patient. As a result, patients impacted by IBC's severity policy



Case ID: 2607026

will not receive a bill from Jefferson until the appeals are resolved (and, as noted, IBC still has not responded to a single appeal).

69. Based on Jefferson's experience, it is likely that patients will become frustrated with Jefferson when they are confronted with amounts owed as co-pays or deductibles many months after the care was provided.

70. Jefferson gave IBC written notice, in a timely manner, of the material adverse financial impact IBC's imposition of its severity policy had on Jefferson.

71. Jefferson's initial calculations show that IBC's severity policy damages Jefferson in excess of $11.5 million.

72. Despite receiving adequate written notice that IBC's severity policy had a material adverse financial impact on Jefferson, IBC did not negotiate the contract's financial terms, as required by the contract. See Exhibit 1 § 19.2.

73. Jefferson has been damaged by IBC's imposition of its severity policy, in an amount to be proven at trial.

**Facts Relevant To IBC's Violation Of The "Two Midnight Rule"**

74. As set forth above, IBC is required to follow the Two Midnight Rule, and pay Jefferson on an inpatient basis when a doctor reasonably believes that a patient's stay in the hospital for medically necessary treatment will cross two midnights.

75. Although IBC can, in some instances "when coverage criteria are not fully established in applicable Medicare statutes, regulations, NCDs or LCDs," 88 Fed. Reg. 22120, at 22328 (April 12, 2023), refer to InterQual, IBC cannot use InterQual to supplant the expectation of the admitting physician, based on "complex medical factors documented in the medical

record," 88 Fed. Reg. 22120, at 22191 (April 12, 2023), that a patient's care is expected to cross two midnights, and therefore qualify as inpatient.

76. Despite being obligated to follow the Two Midnight Rule, IBC has not done so.

77. Instead, IBC has refused to pay for inpatient care when it believes that InterQual criterion were not met.

78. As a result, IBC has denied claims, and, in other instances, paid Jefferson under the lower rate for observation, rather than under the contractually required rate for inpatient care.

79. For example, IBC denied inpatient coverage for a 91 year old man who was admitted to the emergency department with both an implanted and a foley catheter that were not draining (causing him to retain up to 800ml of urine at a time), which led to both blood in his urine and a severe infection, and who stayed in the hospital across four midnights for the surgical implantation of a catheter and infection management.

80. As a second example, IBC denied inpatient coverage for a 56 year old man who was admitted to the emergency department with hypertension and an insulin pump who nonetheless had poorly controlled diabetes (leading to both eye and nerve damage), as well as damage to his stomach and charcot foot (a condition where foot bones and joints weaken and fracture). Upon admission, his glucose level was 150 mg/dL (50% higher than the "top of the range") and his creatinine level was 3.14 (close to triple the "top of the range"). He stayed in the hospital across two midnights before his diabetes could be brought under control.

81. As a third example, IBC denied inpatient coverage for a 59 year old man who was admitted to the emergency department with severe hypotension and a history of severe



Case ID: 2607026

heart disease (including two bypasses, fluid buildup in his chest, and a general inability of his heart to pump blood, as well as chronic respiratory failure, because his feet and arms were swelling and the skin was peeling off. He stayed in the hospital across four midnights for dialysis and blood pressure management.

82. Jefferson gave IBC written notice, in a timely manner, of the material adverse financial impact IBC's violations of the Two Midnight Rule had on Jefferson.

83. Jefferson's initial calculations show that IBC's violations of the Two Midnight Rule damages Jefferson in excess of $24 million.

84. Despite receiving adequate written notice that IBC's violations of the Two Midnight Rule had a material adverse financial impact on Jefferson, IBC did not negotiate the contract's financial terms, as required by the contract. See Exhibit 1 § 19.2.

85. Jefferson has been damaged by IBC's violations of the Two Midnight Rule, in an amount to be proven at trial.

**Facts Relevant To IBC's Imposition Of Its Readmission Policy**

86. On April 1, 2026, IBC promulgated a readmission policy applicable to its Medicare Advantage plans. See Exhibit 4.

87. On April 1, 2026, IBC also promulgated a substantially identical readmission policy applicable to its commercial insurance plans. See Exhibit 5.

88. Under these readmission policy, IBC unilaterally decided that, if a patient was readmitted to Jefferson – either as an inpatient or for observation – within thirty (rather than six) days of being discharged from the hospital, IBC would not pay for the readmission.

89. The longer a patient is home from the hospital, the less control Jefferson has over their medical condition.



Case ID: 2607026

90. For example, if a patient develops an infection the day after being discharged from the hospital, it is a fair inference that the patient "picked up" that infection in the hospital.

91. If, on the other hand, a patient develops an infection 29 days after being discharged from the hospital, it is very difficult – if not impossible – to say why or where the patient "picked up" the infection.

92. As a result, in addition to having a material adverse financial impact on Jefferson, IBC's readmission policy is fundamentally unfair because it penalizes Jefferson for events that are out of Jefferson's control.

93. Even worse, under IBC's readmission policy, there is no way for Jefferson to engage in a "doctor to doctor" conversation with IBC to explain the reasons for the readmission, and why IBC should cover that readmission.

94. Jefferson gave IBC written notice, in a timely manner, of the material adverse financial impact IBC's imposition of its readmission policy had on Jefferson.

95. Jefferson's initial calculations show that IBC's readmission policy damages Jefferson in excess of $18.3 million.

96. Despite receiving adequate written notice that IBC's readmission policy had a material adverse financial impact on Jefferson, IBC did not negotiate the contract's financial terms, as required by the contract. See Exhibit 1 § 19.2.

97. Jefferson has been damaged by IBC's imposition of its readmission policy, in an amount to be proven at trial.

**Facts Relevant To IBC's Imposition Of Its Ambulatory Surgery Center Policy**

98. On March 2, 2026, IBC promulgated an ambulatory surgery center policy applicable to its Medicare Advantage plans. See Exhibit 6.

99. On March 2, 2026, IBC also promulgated a substantially identical ambulatory surgery center policy applicable to its commercial insurance plans. See Exhibit 7.

100. Under IBC's ambulatory surgery center policy, IBC will only pay for certain procedures to be performed in ambulatory surgery centers.

101. By definition, procedures performed in ambulatory surgery centers are outpatient, rather than inpatient.

102. IBC's ambulatory surgery center policy does not acknowledge the myriad of reasons why some procedures should not be done in an ambulatory surgery center.

103. IBC's ambulatory surgery center policy does not acknowledge (or take into account) the inconvenience to both doctors and patients of having to travel to a separate site for surgery (especially if the patient had already presented to the hospital).

104. IBC's ambulatory surgery center policy does not acknowledge (or take into account) the delays which can occur if a procedure has to be scheduled in an ambulatory surgery center.

105. IBC's ambulatory surgery center policy does not compensate Jefferson for the increased administrative time necessary to attempt to convince IBC that its ambulatory surgery center policy should not be applied in specific cases.

106. IBC's ambulatory surgery center policy also materially changes the amounts IBC pays for outpatient services, in violation of Exhibit 1 at Exhibit A-1 § 4.1.



Case ID: 2607026

107. Jefferson gave IBC written notice, in a timely manner, of the material adverse financial impact IBC's imposition of its ambulatory surgery center policy had on Jefferson.

108. Jefferson's initial calculations show that IBC's ambulatory surgery center policy damages Jefferson in excess of $35.4 million.

109. Despite receiving adequate written notice that IBC's ambulatory surgery center policy had a material adverse financial impact on Jefferson, IBC did not negotiate the contract's financial terms, as required by the contract. See Exhibit 1 § 19.2.

110. Jefferson has been damaged by IBC's imposition of its ambulatory surgery center policy, in an amount to be proven at trial.

**Facts Relevant To IBC's Failure To Pay The Required Rates Under Section 340B of the Public Health Service Act, 42 U.S.C. § 256b**

111. Section 340B of the Public Health Service Act requires pharmaceutical manufacturers participating in Medicaid to sell certain outpatient drugs at discounted prices to covered entities that qualify as 340B providers because they care for many uninsured and low-income patients. See 42 U.S.C. § 256b.

112. This is known as the 340B Drug Discount Program.

113. Section 340B(a)(4) specifies which covered entities are eligible to participate in 340B. They include qualifying safety-net hospitals that primarily serve the poor, indigent, or the under- or un-insured. See 42 U.S.C. § 256b(a)(4).

114. Jefferson is a covered entity for purposes of 340B.

115. Jefferson participates in the Medicare program and provides hospital services to individuals who qualify for reimbursement through Medicare.



Case ID: 2607026

116. The Medicare hospital Outpatient Prospective Payment System ("OPPS") governs how Medicare is to pay for services offered in hospital outpatient departments, including at Jefferson. See 42 U.S.C. § 1395*l*.

117. Medicare sets out a formula that CMS must employ annually to set reimbursement rates for certain outpatient drugs provided by hospitals, including Jefferson. See 42 U.S.C. § 1395*l*(t)(14).

118. CMS has two options under the statute: If CMS has conducted a survey of hospitals' acquisition costs for the drugs, CMS may set the reimbursement rates based on the hospitals' average acquisition costs and may vary the reimbursement rates for different groups of hospitals. See 42 U.S.C. § 1395*l*(t)(14)(A)(iii)(I) (the "acquisition cost option"). Alternatively, if CMS has not conducted such a survey, CMS must instead set the reimbursement rates based on the average sales price charged by manufacturers for the drugs (with certain adjustments), and CMS may not vary the reimbursement rates for different hospitals. See 42 U.S.C. § 1395*l*(t)(14)(A)(iii)(II) (the "average sales price option").

119. Prior to 2018, CMS consistently selected the average sales price option and adjusted the rate for outpatient drugs to average sales price plus 6%. See 42 U.S.C. § 1395w-3a(b)(1)(A)-(B).

120. CMS used this same reimbursement rate for outpatient drugs provided by all hospitals, including 340B hospitals.

121. Effective January 1, 2018, however, CMS altered the reimbursement rate for outpatient drugs provided by 340B hospitals by adopting a third methodology not authorized by the Medicare Act. See 82 Fed. Reg. 59353.



Case ID: 2607026

122. CMS did not conduct a survey of hospitals' acquisition costs for outpatient drugs as required under the acquisition cost option; instead, it reduced the reimbursement rate for 340B hospitals to average sales price minus 22.5%. See 82 Fed. Reg. 59353.

123. For 2019, CMS set the reimbursement rate for outpatient drugs provided by 340B hospitals in the same way (i.e., average sales price minus 22.5%).

124. CMS again did not conduct a survey of hospitals' acquisition costs.

125. The American Hospital Association and healthcare providers filed suit to challenge CMS's 2018 and 2019 reimbursement rate for outpatient drugs provided by 340B hospitals.

126. In June 2022, the United States Supreme Court unanimously held that CMS unlawfully reduced reimbursement for 340B hospitals in 2018 and 2019 by changing the outpatient drug rate to average sales price minus 22.5%. See Am. Hosp. Ass'n. v. Becerra, 142 S. Ct. 1896, 1897 (2022).

127. The Supreme Court concluded that, absent a survey of hospitals' acquisition costs, CMS may not treat 340B hospitals differently than non-340B hospitals by lowering their reimbursement for outpatient drugs. See Am. Hosp. Ass'n. v. Becerra, 142 S. Ct. 1896, 1897 (2022).

128. Although the Supreme Court's decision was made in the context of reviewing CMS's reimbursement rate for 2018 and 2019, the Supreme Court's conclusion that CMS's outpatient drug rate for 340B hospitals was "contrary to statute and unlawful" is equally applicable to subsequent years.

129. This is true for the portion of 2022 when Medicare reimbursement for 340B drugs continued to be average sales price minus 22.5%.



Case ID: 2607026

130. The Supreme Court in Am. Hosp. Ass'n. v. Becerra did not specify a remedy for the retroactive underpayments.

131. On remand, the United States District Court for the District of Columbia vacated CMS's Final Rule on 340B payments (82 Fed. Reg. 59353) prospectively.

132. Specifically, the DC District Court vacated the average sales price minus 22.5% payment rate in the Medicare OPPS system for all 340B drugs for periods on or after September 28, 2022, and held that the reimbursement rate would revert to the default rate under the Medicare statute (average sales price plus 6%) on a go-forward basis. See Am. Hosp. Ass'n v. Becerra, 2022 WL 4534617 at *5 (D.D.C. Sept. 28, 2022).

133. With regard to underpayments from January 1, 2018, to September 27, 2022, the DC District Court remanded to CMS to develop a remedy for historical underpayments. See Am. Hosp. Ass'n v. Becerra, 2023 WL 143337 at *1 (D.D.C. Jan. 10, 2023).

134. Jefferson resubmitted claims for 340B drugs with dates of service from January 1, 2022, to September 27, 2022 to traditional Medicare fee for service, and their Medicare Administrative Contractor, Novitas, reprocessed all such claims to correct the previous drug underpayment.

135. On November 8, 2023, CMS published a final rule outlining the remedy for underpaid 340B drugs for dates of service from January 1, 2018, to September 27, 2022.

136. The rule provides affected covered entities with a lump sum payment intended to pay the difference between what the hospital should have been paid and what the hospital was paid based on claims data submitted between 2018 and 2022.



Case ID: 2607026

137. The contract requires IBC to pay for outpatient covered services, including outpatient drugs acquired pursuant to the 340B program, at a percentage of the Medicare allowable rate under the OPPS.

138. From January 1, 2018, to September 27, 2022, IBC paid for outpatient drugs acquired pursuant to the 340B program provided by Jefferson using a methodology that was based on the Medicare rate of average sales price minus 22.5%, which rate has now been held by the Supreme Court to be unlawful and contrary to statute.

139. CMS lacked the authority to set a different reimbursement rate for 340B hospitals absent a survey of acquisition costs and, accordingly, the correct CMS reimbursement amount for these claims, and therefore the correct basis for IBC's payments under the contract, was the same as the CMS payment amount for non-340B hospitals: average sales price plus 6%.

140. Accordingly, because IBC's contractual payment obligation was tied to the Medicare rate, IBC underpaid Jefferson for outpatient drugs acquired through the 340B program.

141. Additionally, under the contract, Jefferson is required to charge IBC insureds the same amount it charges other patients.

142. IBC's imposition of the "average sales price minus 22.5%" rate caused Jefferson to charge IBC insureds a different amount than Jefferson charged other patients.

143. On or around September 27, 2022, IBC began to pay for certain 340B drugs provided by Jefferson based on the corrected Medicare rate of average sales price plus 6% but continued paying for other 340B drugs based on the unlawful rate of Medicare rate of average sales price minus 22.5%.



Case ID: 2607026

144. Jefferson resubmitted its claims for 340B drugs with dates of service between January 1, 2022, and September 27, 2022, based on its expectation that IBC would correct payment on these claims in accordance with the Supreme Court's ruling in Am. Hosp. Ass'n v. Becerra, 142 S. Ct. 1896 (2022) and the DC District Court's decisions on remand.

145. IBC has not done so.

146. IBC has taken the position that footnote one to the contract's outpatient fee schedule insulates IBC from having to correct the 340B payments it made.

147. Footnote one to the contract's outpatient fee schedule states "The parties agree that APC Grouper / Pricer and Fee Schedules published and distributed by CMS shall be used to determine reimbursement under this agreement. Reimbursement shall be the product of the CMS APC Pricer amount (or fee schedule amount) and the CMS Pricer Adjustment Factor. In the event CMS makes mid year updates to APC Grouper/Pricer and/or Fee Schedules, Plan shall update APC Grouper/Pricer within 60 days of CMS' publishing such updates. The parties agree, however, that retrospective changes made by CMS shall not apply." See Exhibit 1 at Exhibit A-1 schedule 42.

148. This language is inapplicable to the 340B pricing issues.

149. CMS did not make a mid year update to APC Grouper/Pricer and/or Fee Schedules.

150. Instead, CMS responded to a Supreme Court finding that CMS had acted illegally.

151. Similarly, CMS did not make a retrospective change.

152. Instead, CMS complied with judicial findings.



Case ID: 2607026

153. Jefferson gave IBC written notice, in a timely manner, of the material adverse financial impact of IBC's failure to make proper 340B payments on Jefferson.

154. Jefferson's initial calculations show that IBC's failure to make proper 340B payments damages Jefferson in excess of $7.2 million.

155. Despite receiving adequate written notice that IBC's failure to make proper 340B payments had a material adverse financial impact on Jefferson, IBC did not negotiate the contract's financial terms, as required by the contract. See Exhibit 1 § 19.2.

156. Jefferson has been damaged by IBC's failure to make proper 340B payments, in an amount to be proven at trial.

157. Jefferson is required to charge IBC's insureds the same amounts it charges others. See Exhibit 1 § 3.3.

**COUNT I – BREACH OF CONTRACT**

158. Jefferson sets forth in paragraphs 1 through 157 as if fully set forth herein.

159. Jefferson has fulfilled its obligations under the contract.

160. IBC has breached the contract, as set forth more fully above, by, *inter alia*, imposing its "severity policy," violating the Two Midnight Rule, imposing its readmission policy, imposing its ambulatory surgery center policy, and failing to pay the required rates under Section 340B.

161. Additionally, IBC has breached the implied duty of good faith and fair dealing, as set forth more fully above, by, *inter alia*, imposing its "severity policy," violating the Two Midnight Rule, imposing its readmission policy, imposing its ambulatory surgery center policy, and failing to pay the required rates under Section 340B.



Case ID: 2607026

162. IBC remains in breach despite having been given timely notice of its breaches.

163. All conditions precedent to Jefferson's right to performance under the contract have been met or waived.

164. Jefferson has been damaged by IBC's breach of the contract, as set forth above.

165. Specifically, as set forth above, Jefferson's damages approach $100 million.

**WHEREFORE**, Thomas Jefferson University, d/b/a Jefferson Health respectfully requests that judgment be entered in its favor, and against Keystone Health Plan East, QCC Insurance Company and AmeriHealth HMO, in an amount to be proven at trial, and that Jefferson be awarded interest, costs, and attorneys' fees, as well as such other relief that this Court finds to be just and equitable.

**COUNT II – DECLARATORY JUDGMENT**

166. Jefferson incorporates the allegations set forth in paragraphs 1 through 157 as if fully set forth herein.

167. Declaratory judgments are equitable in nature. See, e.g., Building Ind. Ass'n of Lancaster Cnty. v. Manheim Twp., 710 A.2d 141, 146–47 (Pa. Commw. Ct.1998).

168. An actionable, justiciable controversy exists between Jefferson and IBC as to whether IBC's imposition of its severity policy, violations of the Two Midnight Rule, imposition of its readmission policy, imposition of its ambulatory surgery center policy, and failure to pay the required rates under Section 340B violates the contract between the parties.



Case ID: 2607026

169. Jefferson contends that IBC's actions violate the contract, while IBC contends that they do not.

170. The parties require a determination of their respective rights and duties relating to the contract.

171. There is a substantial, continuing controversy between the parties of sufficient immediacy and reality as to warrant the issuance of a declaratory judgment. The controversy is not hypothetical or abstract but involves a definite and concrete dispute touching the legal relations of parties having adverse legal interests.

172. Jefferson is in present and immediate need of a declaration of its rights with respect to these issues because IBC's actions have created uncertainty regarding the parties' respective rights and obligations under the contract and under applicable law.

173. Absent a judicial declaration, Jefferson will continue to suffer harm in the form of both lost revenues and administrative burden that is so significant that it could impact patient care and contribute to patient confusion regarding patient financial obligations.

174. Jefferson is entitled to a permanent injunction precluding IBC from imposing its "severity policy," violating the Two Midnight Rule, imposing its readmission policy, imposing its ambulatory surgery center policy, and/or failing to pay the required rates under Section 340B.



Case ID: 2607026

**WHEREFORE**, Thomas Jefferson University, d/b/a Jefferson Health respectfully requests that judgment be entered in its favor, and against Keystone Health Plan East, QCC Insurance Company and AmeriHealth HMO, and that a declaration be entered that IBC cannot impose its "severity policy," violate the Two Midnight Rule, impose its readmission policy, impose its ambulatory surgery center policy, or fail to pay the required rates under Section 340B, and that Jefferson be awarded interest, costs, and attorneys' fees, as well as such other relief that this Court finds to be just and equitable.

Respectfully submitted,

COZEN O'CONNOR

Dated: July 22, 2026

By: __*/s/ Aaron Krauss*_________

Aaron Krauss (62419)
R. Christopher Raphaely (59093)
Danielle E. Sapega (311561)
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4181
akrauss@cozen.com
craphaely@cozen.com
dsapega@cozen.com
Attorneys for Thomas Jefferson University

**VERIFICATION**

I, Allison Yudt, do hereby state that I am authorized to make this Verification on Thomas Jefferson University's behalf, and that the statements set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I further state pursuant to Pennsylvania Rule of Civil Procedure 1024(b) that, upon reasonable investigation, I have been unable to determine which of the inconsistent facts which are plead in the alternative and/or in the hypothetical are true, but I reasonably believe that one set of the inconsistent facts are true.

I make this Verification subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Executed on July 22, 2026 Allison M. Yudt

Advanced Search

Filed and Attested by the
Office of Judicial Records
22 JUL 2026 04:06 pm
B. BALILONIS




# Claim Payment Policy Bulletin

Title:

Reimbursement for Emergent Inpatient Admissions

Policy #:

MA00.059

**This policy is applicable to the Company's Medicare Advantage products only. Policies that are applicable to the Company's commercial products are accessible via a separate commercial policy database.**

**The Company makes decisions on coverage based on the Centers for Medicare and Medicaid Services (CMS) regulations and guidance, benefit plan documents and contracts, and the member's medical history and condition. If CMS does not have a position addressing a service, the Company makes decisions based on Company Policy Bulletins. Benefits may vary based on contract, and individual member benefits must be verified. The Company determines medical necessity only if the benefit exists and no contract exclusions are applicable. Although the Medicare Advantage Policy Bulletin is consistent with Medicare's regulations and guidance, the Company's payment methodology may differ from Medicare.**

**When services can be administered in various settings, the Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition. This decision is based on the member's current medical condition and any required monitoring or additional services that may coincide with the delivery of this service.**

**This Policy Bulletin document describes the status of CMS coverage, medical terminology, and/or benefit plan documents and contracts at the time the document was developed. This Policy Bulletin will be reviewed regularly and be updated as Medicare changes their regulations and guidance, scientific and medical literature becomes available, and/or the benefit plan documents and/or contracts are changed.**

## Policy

**Coverage is subject to the terms, conditions, and limitations of the member's Evidence of Coverage.**

This policy applies to facility providers billing on a CMS-1450 (UB-04) claim form, or the equivalent 837i form, for Medicare Advantage members enrolled in Medicare Advantage products. This policy applies to participating hospitals and hospital health systems reimbursed based on DRG/case rate methodologies. The policy does not apply to participating hospitals and hospital health systems reimbursed on a per diem basis.

For purposes of payment determination under this policy, the criteria, definitions, and requirements set forth herein supersede the Hospital Manual, including but not limited to the Hospital Manual's definition of admission review. The Hospital Manual's definition of admission may continue to apply for other operational and payment determination purposes not governed by this payment policy. To the extent necessary, the Hospital Manual will be updated to align. However, until revisions to the Hospital Manual are issued, this payment policy shall prevail.

This policy establishes the Company's claim payment policy regarding emergent inpatient admissions of up to and including five (5) inpatient days. THIS POLICY DOES NOT AFFECT COVERAGE DETERMINATIONS. All coverage determinations are made by the Company based on CMS regulations and guidance, benefit plan documents and contracts, and the

Case ID: 2607026

member's medical history and condition.

The intent of this policy is to address the Company's claim payment policy for emergent inpatient admissions, up to and including inpatient day five (5), for facility providers reimbursed based on DRG/case rate methodologies.

When a member is emergently admitted to a hospital, for up to and including 5 inpatient days, and determination of coverage at the acute inpatient level of care has been issued by the Company, the Company shall determine the payment amount for the covered inpatient hospital stay based on the following intensity of services criteria:

- Payment will be made at the provider's contracted acute inpatient DRG rate when the medical records submitted to the Company for the admission are determined to meet InterQual acute inpatient criteria. This is not a medical necessity review for inpatient services, but instead a payment level review.
- Payment will be made at the provider's contracted observation rate when the medical records submitted to the Company for the admission are determined to not meet InterQual acute inpatient criteria. This is not a medical necessity review for inpatient services, but instead a payment level review, and does not affect the coverage determination.

Time spent in custodial care, delays in care, including for procedures, or delays in post-discharge planning are not included in the calculation of the length of the member's stay.

InterQual criteria will not be used to determine whether an inpatient stay is medically necessary. Instead, InterQual criteria will be used to determine the level of payment made for emergent inpatient admissions. Providers have the option to request a review of the payment determination (including the right to have a discussion with a Company Medical Director), and to dispute the payment determination under this policy, if they believe the admission meets InterQual acute inpatient criteria.

**POLICY EXCEPTIONS**

The intensity of services payment policy does not apply to the following:

- Cases involving an unexpected death, CMS inpatient-only procedures, and newly initiated mechanical ventilations. In those instances, the hospital will be reimbursed at the acute inpatient DRG rate.
- Behavioral health admissions, long-term acute care inpatient admissions, and acute rehabilitation confinements.

**REQUIRED DOCUMENTATION**

The individual's medical record is used to determine the level of payment as described above. These medical records may include but are not limited to records from the professional provider's office, hospital, nursing home, home health agencies, therapies, and test reports.

The Company may conduct reviews and audits of services furnished to our members on a pre-payment or post-payment basis. All documentation is to be available to the Company upon request.

## Guidelines

Claims are processed according to the statements in this policy. When a medical policy on this topic also exists, the medical necessity criteria listed in the medical policy must be met.

## Description

Case ID: 2607026

An inpatient day is an admission period that begins at midnight on the day of admission and ends 24 hours later. The midnight-to-midnight method is to be used in reporting inpatient days even if the hospital uses a different definition for other purposes. Any part of an inpatient day, including the day of admission, counts as an inpatient day. The day of discharge is not counted as an inpatient day.

An inpatient admission requires an overnight stay, which must be at least 24 hours. An overnight stay is defined as a period of at least 24 hours. Therefore, an individual presenting to the emergency department at 9:00 p.m. and leaving at 11:00 a.m. the following morning is not considered an inpatient admission.

## Coding

**Inclusion of a code in this table does not imply reimbursement. Eligibility, benefits, limitations, exclusions, precertification/referral requirements, provider contracts, and Company policies apply.**

**The codes listed below are updated on a regular basis, in accordance with nationally accepted coding guidelines. Therefore, this policy applies to any and all future applicable coding changes, revisions, or updates.**

**In order to ensure optimal reimbursement, all health care services, devices, and pharmaceuticals should be reported using the billing codes and modifiers that most accurately represent the services rendered, unless otherwise directed by the Company.**

**The Coding Table lists any CPT, ICD-10, and HCPCS billing codes related only to the specific policy in which they appear.**

### CPT Procedure Code Number(s)
N/A

### ICD - 10 Procedure Code Number(s)
N/A

### ICD - 10 Diagnosis Code Number(s)
N/A

### HCPCS Level II Code Number(s)
N/A

### Revenue Code Number(s)
N/A

## Policy History

**Revisions From MA00.059:**

| | |
|---|---|
| 03/05/2026 | This version of the policy will become effective on 03/05/2026.<br><br>This new policy has been developed to communicate the Company's claim payment policy for emergent inpatient admissions, up to and including inpatient day five (5). This policy applies to Medicare Advantage members only. |

**Version Effective Date:** 03/05/2026

**Version Issued Date:** 03/05/2026

**Version Reissued Date:** N/A

Case ID: 260702609

Advanced Search

Filed and Attested by the
Office of Judicial Records
22 JUL 2026 04:06 pm
B. BALILONIS




## Notification

**Hospital Readmissions**

**Notification Issue Date:** 04/01/2026

This version of the policy will become effective 05/01/2026.

Policy number MA00.023c has been updated to communicate the Company's revised reimbursement position to include observation stays within 30 days of inpatient discharge for a related condition as not eligible for separate reimbursement.

# Claim Payment Policy Bulletin

Title:

**Hospital Readmissions**

Policy #:

**MA00.023c**

**This policy is applicable to the Company's Medicare Advantage products only. Policies that are applicable to the Company's commercial products are accessible via a separate commercial policy database.**

**The Company makes decisions on coverage based on the Centers for Medicare and Medicaid Services (CMS) regulations and guidance, benefit plan documents and contracts, and the member's medical history and condition. If CMS does not have a position addressing a service, the Company makes decisions based on Company Policy Bulletins. Benefits may vary based on contract, and individual member benefits must be verified. The Company determines medical necessity only if the benefit exists and no contract exclusions are applicable. Although the Medicare Advantage Policy Bulletin is consistent with Medicare's regulations and guidance, the Company's payment methodology may differ from Medicare.**

**When services can be administered in various settings, the Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition. This decision is based on the member's current medical condition and any required monitoring or additional services that may coincide with the delivery of this service.**

**This Policy Bulletin document describes the status of CMS coverage, medical terminology, and/or benefit plan documents and contracts at the time the document was developed. This Policy Bulletin will be reviewed regularly and be updated as Medicare changes their regulations and guidance, scientific and medical literature becomes available, and/or the benefit plan documents and/or contracts are changed.**

## Policy

**Coverage is subject to the terms, conditions, and limitations of the member's Evidence of Coverage.**



Case ID: 2607026

This policy applies to participating hospitals and hospital health systems reimbursed based on DRG/case rate methodologies. The policy does not apply to participating hospitals and hospital health systems reimbursed on a per diem basis. The policy does not apply to non-participating hospitals and hospital health systems.

**READMISSION WITHIN 30 DAYS OF INPATIENT DISCHARGE**

Acute care hospital stays (i.e., both inpatient and observation stays) to the same acute care hospital, or an acute care hospital within the same health system, within 30 days of discharge from the previous inpatient stay and/or for a condition related to the original inpatient stay (e.g., the same major diagnostic category [MDC], a post-operative infection, sepsis, or complication diagnosis), are not eligible for separate reimbursement when each hospital stay is paid per DRG or case rate. This will eliminate the payment of multiple case rates for a single clinical event.

For purposes of reimbursement, when the above criteria are met, the Company will treat all acute care hospital stays as a single clinical event. The claim with the higher payment will remain in place, and the claim(s) for the other related stays(s) will be retracted post payment.

CLAIM RETRACTIONS

Claim retractions will occur based on a retrospective claim audit review. Hospitals will be notified prior to any retrospective claim retraction and will be afforded the facility audit review process for dispute resolution.

**POLICY EXCEPTIONS**

This policy does not apply to the services listed below:

- Maternity and newborn care, with the exception of subsequent stays (e.g., readmission) for a condition directly related to the delivery, such as infection, post C-section ileus or other C-section or vaginal delivery complications
- Planned elective hospital stays (e.g., chemotherapy)
- Transplant services
- Acute care transfers from one institution to another within the same health system
- A condition unrelated to the original inpatient stay
- Discharge from the hospital against medical advice
- Behavioral health, psychiatric, and/or drug and alcohol hospital stays
- Acute physical rehabilitation

**REQUIRED DOCUMENTATION**

At the request of the Company or one of its affiliates, the hospital(s) must submit medical records and supporting documentation pertaining to the original inpatient stay and subsequent stay(s). Medical records requested must include the following information:

- Admission and discharge summaries
- Physician orders
- Emergency room records
- Progress notes
- Nurse notes
- Laboratory and diagnostic testing reports
- History and physical

---

Guidelines

The Company's reimbursement policy for hospital readmissions will be reviewed on an ongoing basis. This review may result in changes to the current policy application (e.g., from post-pay to pre-pay).

## Description

According to the Centers for Medicare and Medicaid Services (CMS), acute care hospital readmissions may result from actions taken or omitted during a member's initial acute care hospital stay. Historically, nearly 20% of all hospital discharges have had a readmission within 30 days.

**READMISSION WITHIN 30 DAYS OF INPATIENT DISCHARGE**

Readmission within 30 days of discharge, for the purposes of this policy, is an unplanned acute care inpatient admission or observation stay at an acute care hospital within 30 days of the previous inpatient stay for a condition related to the original inpatient stay (e.g., same major diagnostic category [MDC], post-operative infection, sepsis, or complication diagnosis).

The 30-day readmission provision includes the day of discharge and the following 30 calendar days.

Observation stays are acute care hospital stays for observation services. Observation services are considered an outpatient service and involve the use of a hospital bed with periodic monitoring by nursing or ancillary staff to evaluate and treat an individual's condition or to determine the need for a possible inpatient admission.

Multiple readmissions under the 30-day readmission provision consist of two or more unplanned acute care hospital stays within 30 days from the most recent inpatient date of discharge, and are for a condition related to the most recent inpatient hospital stay (e.g., the same major diagnostic category [MDC], a post-operative infection, sepsis, or complication diagnosis).

## References


Centers for Medicare & Medicaid Services (CMS). *Medicare Claims Processing Manual.* Chapter 3: Inpatient Hospital Billing. §40: Billing Coverage and Utilization Rules for PPS and Non-PPS Hospitals, p. 91. [CMS Web site]. 08/14/25. Available at: http://www.cms.gov/manuals/downloads/clm104c03.pdf. Accessed February 27, 2026.

Centers for Medicare & Medicaid Services (CMS). *Medicare Learning Network.* Acute Care Hospital Inpatient Prospective Payment. [CMS Web site]. January 2026. Available at: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/html/medicare-payment-systems.html. Accessed February 27, 2026.


## Coding

**Inclusion of a code in this table does not imply reimbursement. Eligibility, benefits, limitations, exclusions, precertification/referral requirements, provider contracts, and Company policies apply.**

**The codes listed below are updated on a regular basis, in accordance with nationally accepted coding guidelines. Therefore, this policy applies to any and all future applicable coding changes, revisions, or updates.**

**In order to ensure optimal reimbursement, all health care services, devices, and pharmaceuticals should be reported using the billing codes and modifiers that most accurately represent the services rendered, unless otherwise directed by the Company.**

**The Coding Table lists any CPT, ICD-10, and HCPCS billing codes related only to the specific policy in which they appear.**

### CPT Procedure Code Number(s)

N/A

### ICD - 10 Procedure Code Number(s)

Case ID: 2607026

N/A

## ICD - 10 Diagnosis Code Number(s)
N/A

## HCPCS Level II Code Number(s)
N/A

## Revenue Code Number(s)
N/A

## Policy History

**Revisions From MA00.023c:**

| | |
|---|---|
| 05/01/2026 | This version of the policy will become effective 05/01/2026.<br><br>Policy number MA00.023c has been updated to communicate the Company's revised reimbursement position to include observation stays within 30 days of inpatient discharge for a related condition as not eligible for separate reimbursement. |

**Revisions From MA00.023b:**

| | |
|---|---|
| 08/07/2024 | This policy has been reissued in accordance with the Company's annual review process. |
| 01/01/2024 | **Effective 01/01/2024 this policy applies to New Jersey Medicare Advantage (MA) lines of business.** |
| 07/01/2022 | This version of the policy will become effective 07/01/2022. This policy has been updated to communicate the Company's revised reimbursement criteria for inpatient readmissions with 6-30 days.<br><br>Criteria for readmissions within five days and readmissions within 6-30 days has been revised to readmissions within 30-days of discharge to the same inpatient acute care hospital, or inpatient acute care hospital within the same health system, from the previous inpatient stay and/or for a condition related to the original inpatient stay (e.g., same major diagnostic category [MDC], post-operative infection, sepsis, or complication diagnosis), are not eligible for separate reimbursement, when each inpatient hospital stay is paid per case or per admission. This will eliminate the payment of multiple case rates for a single clinical event.<br><br>The following exception to the inpatient readmission rule has been added to the policy:<br>• Planned Elective Readmissions |

**Revisions From MA00.023a:**

| | |
|---|---|
| 11/17/2021 | This policy has been reissued in accordance with the Company's annual review process. |
| 11/20/2019 | The policy has been reviewed and reissued to communicate the Company’s continuing position on Inpatient Hospital Readmission. |
| 01/15/2017 | This version of the policy will become effective 01/15/2017.<br><br>This version has been updated to include readmission within 6-30 days of discharge.<br>Language and format have been updated in the Description and Policy sections. |

**Revisions From MA00.023:**

| | |
|---|---|
| 01/01/2015 | This is a new policy. |

Case ID: 2607026

**Version Effective Date:** 05/01/2026

**Version Issued Date:** 05/01/2026

**Version Reissued Date:** N/A

independence

Advanced Search

Filed and Attested by the
Office of Judicial Records
22 JUL 2026 04:06 pm
B. BALILONIS




## Notification

**Hospital Readmissions**

**Notification Issue Date:** 04/01/2026

This version of the policy will become effective 05/01/2026.

Policy number 00.01.47d has been updated to communicate the Company's revised reimbursement position that inpatient readmissions and observation stays within 30 days of inpatient discharge for a related condition are not eligible for separate reimbursement.

# Claim Payment Policy Bulletin

Title:

**Hospital Readmissions**

Policy #:

**00.01.47d**

**This policy is applicable to the Company's commercial products only. Policies that are applicable to the Company's Medicare Advantage products are accessible via a separate Medicare Advantage policy database.**

**Application of Claim Payment Policy is determined by benefits and contracts. Benefits may vary based on product line, group or contract. Medical necessity determination applies only if the benefit exists and no contract exclusions are applicable. Individual member benefits must be verified.**

**In products where members are able to self-refer to providers for care and services, members are advised to use participating providers in order to receive the highest level of benefits.When services can be administered in various settings, the Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition. This decision is based on the member's current medical condition and any required monitoring or additional services that may coincide with the delivery of this service.**

**For more information on how Claim Payment Policy Bulletins are developed, go to the Policy Types and Descriptions section of this Medical Policy Web site.**

## Policy

**Coverage is subject to the terms, conditions, and limitations of the member's contract.**

This policy applies to participating hospitals and hospital health systems reimbursed based on DRG/case rate methodologies. The policy does not apply to participating hospitals and hospital health systems reimbursed on a per diem basis. The policy does not apply to non-participating hospitals and hospital health systems.

**READMISSION WITHIN 30 DAYS OF INPATIENT DISCHARGE**

Acute care hospital stays (i.e., both inpatient and observation stays) to the same acute care hospital, or an acute care hospital within the same health system, within 30 days of discharge from the previous inpatient stay and/or for a condition related to the original inpatient stay (e.g., the same major diagnostic category [MDC], a post-operative infection, sepsis, or complication diagnosis), are not eligible for separate reimbursement when each hospital stay is paid per DRG or case rate. This will eliminate the payment of multiple case rates for a single clinical event.

For purposes of reimbursement, when the above criteria are met, the Company will treat all acute care hospital stays as a single clinical event. The claim with the higher payment will remain in place, and the claim(s) for the other related stays(s) will be retracted post payment.

CLAIM RETRACTIONS

Claim retractions will occur based on a retrospective claim audit review. Hospitals will be notified prior to any retrospective claim retraction and will be afforded the facility audit review process for dispute resolution.

**POLICY EXCEPTIONS**

This policy does not apply to the services listed below:

- Maternity and newborn care, with the exception of subsequent stays (e.g., readmission) for a condition directly related to the delivery, such as infection, post C-section ileus or other C-section or vaginal delivery complications
- Planned elective hospital stays (e.g., chemotherapy)
- Transplant services
- Acute care transfers from one institution to another within the same health system
- A condition unrelated to the original inpatient stay
- Discharge from the hospital against medical advice
- Behavioral health, psychiatric, and/or drug and alcohol hospital stays
- Acute physical rehabilitation

**REQUIRED DOCUMENTATION**

At the request of the Company or one of its affiliates, the hospital(s) must submit medical records and supporting documentation pertaining to the original inpatient stay and subsequent stay(s). Medical records requested must include the following information:

- Admission and discharge summaries
- Physician orders
- Emergency room records
- Progress notes
- Nurse notes
- Laboratory and diagnostic testing reports
- History and physical

## Guidelines

The Company's reimbursement policy for hospital readmissions will be reviewed on an ongoing basis. This review may result in changes to the current policy application (e.g., from post-pay to pre-pay).

## Description

According to the Centers for Medicare and Medicaid Services (CMS), acute care hospital readmissions may result from actions taken or omitted during a member's initial acute care hospital stay. Historically, nearly 20% of all hospital discharges have had a readmission within 30 days.

**READMISSION WITHIN 30 DAYS OF INPATIENT DISCHARGE**

Readmission within 30 days of discharge, for the purposes of this policy, is an unplanned acute care inpatient admission or observation stay at an acute care hospital within 30 days of the previous inpatient stay for a condition related to the original inpatient stay (e.g., same major diagnostic category [MDC], post-operative infection, sepsis, or complication diagnosis).

The 30-day readmission provision includes the day of discharge and the following 30 calendar days.

Observation stays are acute care hospital stays for observation services. Observation services are considered an outpatient service and involve the use of a hospital bed with periodic monitoring by nursing or ancillary staff to evaluate and treat an individual's condition or to determine the need for a possible inpatient admission.

Multiple readmissions under the 30-day readmission provision consist of two or more unplanned acute care hospital stays within 30 days from the most recent inpatient date of discharge, and are for a condition related to the most recent inpatient hospital stay (e.g., the same major diagnostic category [MDC], a post-operative infection, sepsis, or complication diagnosis).

## References

Centers for Medicare & Medicaid Services (CMS). *Medicare Claims Processing Manual.* Chapter 3: Inpatient Hospital Billing. §40: Billing Coverage and Utilization Rules for PPS and Non-PPS Hospitals, p. 91. [CMS Web site]. 08/14/25. Available at: http://www.cms.gov/manuals/downloads/clm104c03.pdf. Accessed February 27, 2026.

Centers for Medicare & Medicaid Services (CMS). *Medicare Learning Network.* Acute Care Hospital Inpatient Prospective Payment. [CMS Web site]. January 2026. Available at: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/html/medicare-payment-systems.html. Accessed February 27, 2026.

## Coding

**Inclusion of a code in this table does not imply reimbursement. Eligibility, benefits, limitations, exclusions, precertification/referral requirements, provider contracts, and Company policies apply.**

**The codes listed below are updated on a regular basis, in accordance with nationally accepted coding guidelines. Therefore, this policy applies to any and all future applicable coding changes, revisions, or updates.**

**In order to ensure optimal reimbursement, all health care services, devices, and pharmaceuticals should be reported using the billing codes and modifiers that most accurately represent the services rendered, unless otherwise directed by the Company.**

**The Coding Table lists any CPT, ICD-10, and HCPCS billing codes related only to the specific policy in which they appear.**

### CPT Procedure Code Number(s)

N/A

### ICD - 10 Procedure Code Number(s)

N/A

### ICD - 10 Diagnosis Code Number(s)

N/A

### HCPCS Level II Code Number(s)

N/A

### Revenue Code Number(s)

N/A

## Policy History

**Revisions From 00.01.47d:**

| | |
|---|---|
| 05/01/2026 | This version of the policy will become effective 05/01/2026.<br><br>Policy number 00.01.47d has been updated to communicate the Company's revised reimbursement position that inpatient readmissions and observation stays within 30 days of inpatient discharge for a related condition are not eligible for separate reimbursement. |

**Revisions From 00.01.47c:**

| | |
|---|---|
| 08/07/2024 | This policy has been reissued in accordance with the Company's annual review process. |
| 11/17/2021 | This policy has been reissued in accordance with the Company's annual review process. |
| 11/20/2019 | The policy has been reviewed and reissued to communicate the Company's continuing position on Inpatient Hospital Readmission. |

Effective 10/05/2017 this policy has been updated to the new policy template format.

**Version Effective Date:** 05/01/2026

**Version Issued Date:** 05/01/2026

**Version Reissued Date:** N/A

| Advanced Search

Filed and Attested by the
Office of Judicial Records
22 JUL 2026 04:06 pm
B. BALILONIS




## Notification

**Site of Care for Elective Procedures [Hospital Outpatient Setting to Ambulatory Surgical Center (ASC)]**

**Notification Issue Date:** 03/02/2026

This new policy will become effective 06/01/2026.

This new policy has been developed to communicate the Company's coverage criteria for certain planned elective medically necessary procedures performed in a hospital outpatient site of care and/or an ambulatory surgical center site of care.

---

***Note***: On 03/06/2026 this policy in Notification was updated. The code list in Attachment A has been refined to communicate certain planned elective procedures that generally do not support a hospital outpatient admission but may be appropriate for an ambulatory surgical center (ASC). The policy will become effective 06/01/2026.

***Note***: On 03/25/2026, this policy in Notification was updated to reflect additional refinements to the code list in Attachment A. The policy will become effective 06/01/2026.

## Medical Policy Bulletin

Title:

**Site of Care for Elective Procedures [Hospital Outpatient Setting to Ambulatory Surgical Center (ASC)]**

Policy #:

**MA12.005**

**This policy is applicable to the Company's Medicare Advantage products only. Policies that are applicable to the Company's commercial products are accessible via a separate commercial policy database.**

**The Company makes decisions on coverage based on the Centers for Medicare and Medicaid Services (CMS) regulations and guidance, benefit plan documents and contracts, and the member's medical history and condition. If CMS does not have a position addressing a service, the Company makes decisions based on Company Policy Bulletins. Benefits may vary based on contract, and individual member benefits must be verified. The Company determines medical necessity only if the benefit exists and no contract exclusions are applicable. Although the Medicare Advantage Policy Bulletin is consistent with Medicare's regulations and guidance, the Company's payment methodology may differ from Medicare.**

**When services can be administered in various settings, the Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition. This decision is based on the member's current medical condition and any required monitoring or additional services that may coincide with the delivery of this service.**

**This Policy Bulletin document describes the status of CMS coverage, medical terminology, and/or benefit plan documents and contracts at the time the document was developed. This Policy Bulletin will be reviewed regularly and be updated as Medicare changes their regulations and guidance, scientific and medical literature becomes available, and/or the benefit plan documents and/or contracts are changed.**

---

## Policy

**Coverage is subject to the terms, conditions, and limitations of the member's Evidence of Coverage.**

The Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition.

In the absence of coverage criteria from applicable Medicare statutes, regulations, NCDs, LCDs, CMS manuals, or other Medicare coverage documents, this policy uses internal coverage criteria developed by the Company in consideration of peer-reviewed medical literature, clinical practice guidelines, and/or regulatory status.

### POLICY EXCEPTIONS

This policy does not apply to the services listed below:

- Emergency claims
- Pediatric claims (age less than 18 years old)

### MEDICALLY NECESSARY

There are certain planned elective procedures that generally do not support an outpatient hospital admission but may be appropriate for an ambulatory surgical center (ASC) if the anticipated postoperative care requirements can be met in an ASC. When there are multiple options for the site of care, and in the absence of any clinical contraindication, the most appropriate and cost-effective setting with the proper equipment and level of support to perform the service will be approved.

The services included in the coding section of this policy require precertification if they are performed in an outpatient hospital site of service.

Certain planned elective procedures performed in a hospital outpatient department may be considered medically necessary when the individual has one of the following clinical conditions that puts them at an increased risk for complications (this is not an all-inclusive list):

**Anesthesia Risk**

Case ID: 2607026

- ASA classification III or higher
- History of complication of anesthesia
- Documentation of alcohol dependence or history of cocaine use
- Prolonged surgery (> 3 hours)

**Cardiovascular Risk**

- Cardiac arrhythmia (symptomatic arrhythmia despite medication)
- Coronary artery disease (CAD)/peripheral vascular disease (PVD) [ongoing cardiac ischemia requiring medical management or recently placed (within 1 year) drug-eluting stent]
- History of cerebrovascular accident (CVA) or transient ischemic attack (TIA) [recent event (< 3 months)]
- History of myocardial infarction (MI) [recent event (< 3 months)]
- Individuals with drug-eluting stents (DES) placed within one year or bare metal stents (BMS) or plain angioplasty within 90 days unless acetylsalicylic acid and antiplatelet drugs will be continued by agreement of surgeon, cardiologist, and anesthesia
- Ongoing evidence of myocardial ischemia
- Resistant hypertension (Poorly Controlled)
- Severe valvular heart disease
- Uncompensated chronic heart failure (CHF) (NYHA class III or IV)

**Liver Risk**

- Advanced liver disease (MELD Score > 8)

**Pulmonary Risk**

- Chronic obstructive pulmonary disease (COPD) (FEV1 < 50%)
- Poorly Controlled asthma (FEV1 < 80% despite medical management)
- Sleep apnea [moderate to severe obstructive sleep apnea (OSA)]

**Metabolic, Hepatic or Renal Risk**

- End-stage renal disease [(hyperkalemia above reference range) receiving peritoneal or hemodialysis
- Uncontrolled diabetes with recurrent diabetic ketoacidosis (DKA) or severe hypoglycemia within the last 6 months
- Morbid obesity (BMI greater than or equal to 50)

**Hematologic/Immunologic Risk**

- Hereditary bleeding disorder such as factor VIII, IX, or von Willebrand's disease
- The procedure being performed carries a high risk of significant blood loss that requires transfusion

**Other**

- Advance surgical planning determines an individual requires overnight recovery and care following a surgical procedure
- Developmental stage or cognitive status warranting use of a hospital outpatient department

- Pregnancy

**REQUIRED DOCUMENTATION**

The individual's medical record must reflect the medical necessity for the care provided. These medical records may include, but are not limited to: records from the professional provider's office, hospital, nursing home, home health agencies, therapies, and test reports.

The Company may conduct reviews and audits of services to our members, regardless of the participation status of the provider. All documentation is to be available to the Company upon request. Failure to produce the requested information may result in a denial for the service.

## Guidelines

**BENEFIT APPLICATION**

Subject to the terms and conditions of the applicable Evidence of Coverage, use of the ambulatory surgical center may be covered under the medical benefits of the Company's Medicare Advantage products when the medical necessity criteria listed in the medical policy are met.

The following will be considered to determine whether the elective procedure is being performed in an optimal clinical setting:

- Member's specific benefit plan
- Geographic availability of an in-network provider
- Ambulatory surgical care (ASC) capability
- Physician privileging
- Significant member comorbidities
- American Society of Anesthesiologist (ASA) physical status (PS), classification system

**AMERICAN SOCIETY OF ANESTHESIOLOGISTS (ASA) PHYSICAL STATUS CLASSIFICATION SYSTEM**

- ASA I: A normal, healthy individual
- ASA II: An individual with mild systemic disease
- ASA III: An individual with severe systemic disease
- ASA IV: An individual with severe systemic disease that is a constant threat to life
- ASA V: A moribund individual who is not expected to survive without the operation
- ASA VI: A declared brain-dead individual whose organs are being harvested

**New York Heart Association (NYHA) Functional Classification**

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation or shortness of breath. |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, shortness of breath or chest pain. |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, shortness of breath or chest pain. |
| IV | Symptoms of heart failure at rest. Any physical activity causes further discomfort. |

Source- AHA website 2026

## Description

**AMBULATORY SURGICAL CENTER**

An ambulatory surgery center, or ASC, is a freestanding ambulatory healthcare facility, other than a physician's office, that provides same-day surgical care, including diagnostic and surgical procedures on an ambulatory basis. The surgeries conducted in ASCs are typically less invasive than those conducted in a hospital inpatient setting.

**HOSPITAL OUTPATIENT SETTING**

A hospital outpatient setting is defined as a setting where an individual arrives and is registered at a hospital without the need for an acute inpatient setting to undergo the procedure, and is discharged on the same date of the procedure or within the timeframe for observation. This includes on-campus outpatient and off-campus outpatient setting.

**AMERICAN SOCIETY OF ANESTHESIOLOGISTS (ASA) PHYSICAL STATUS CLASSIFICATION SYSTEM**

The American Society of Anesthesiologists (ASA) physical status classification system, and/or significant comorbidities may be taken into account. The ASA risk scoring system is regarded by hospitals, legal firms, accrediting bodies, and other healthcare groups as a preoperative health grading system for individuals undergoing a surgical procedure.

---

## References

Ambulatory Surgery Center Association (ASC). What is an asc? [ASCA website] 2025. Available at: https://www.ascassociation.org/asca/about-ascs/surgery-centers. Accessed January 26, 2026.

American Academy of Otolaryngology-Head and Neck Surgery Position Statement: Ambulatory Procedures (2021). Available at: https://www.entnet.org/resource/position-statement-ambulatory-procedures/. Accessed on January 26, 2026.

American College of Surgeons (ACS) National Surgical Quality Improvement Program (NSQIP®). Surgical risk calculator. [ACS Web site}. 06/2023. Available at: https://riskcalculator.facs.org/RiskCalculator/. Accessed January 26, 2026.

American Heart Association (AHA). Classes and stages of heart failure. [AHA Web Site] 2026. Available at: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure . Accessed January 07, 2026.

American Society of Anesthesiologists (ASA). Statement on ASA physical status classification system. [ASA Web site]. 12/13/2020. Updated 10/15/2025. Available at: https://www.asahq.org/standards-and-practice-parameters/statement-on-asa-physical-status-classification-system. Accessed January 7, 2026.

Centers for Medicare & Medicaid Services (CMS). ASC Payment Rates-Addenda, 2026, January 2026 ASC Approved HCPCS Code and Payment Rates. [CMS Web site]. 01/01/2026. Available at: https://www.cms.gov/medicare/payment/prospective-payment-systems/ambulatory-surgical-center-asc/asc-payment-rates-addenda. Accessed January 03, 2026.

Centers for Medicare & Medicaid Services (CMS). Medicare Claims Processing Manual, Chapter 14: Ambulatory Surgical Centers. [CMS internet-only manuals {IOMs} Web site]. 03/24/2023. Available at: https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/clm104c14.pdf. Accessed January 26, 2026.

Chung F, Abdullah HR, Liao P. STOP-Bang questionnaire: a practical approach to screen for obstructive sleep apnea. *Chest.* 2016;149(3):631-638.

Chung F, Subramanyam R, Liao P, Sasaki E, Shapiro C, Sun Y. High STOP-Bang score indicates a high probability of obstructive sleep apnoea. Br J Anaesth. 2012 May;108(5):768-75. doi: 10.1093/bja/aes022. Epub 2012 Mar 8. PMID: 22401881; PMCID: PMC3325050. Available at: https://pubmed.ncbi.nlm.nih.gov/22401881/. Accessed January 26, 2026.

Farney RJ, Walker BS, Farney RM, et al. The STOP-Bang equivalent model and prediction of severity of obstructive sleep apnea: relation to polysomnographic measurements of the apnea/hypopnea index. *J Clin Sleep Med.* 2011;7(5):459-465B.

Federation of State Medical Boards (FSMB). Report of the special committee on outpatient (office-based) surgery. 2002. Available at: https://www.fsmb.org/siteassets/advocacy/policies/outpatient-office-based-surgery.pdf. Accessed January 26, 2026.

Fleisher LA, Pasternak LR, Herbert R, et al. Inpatient hospital admission and death after outpatient surgery in elderly patients: importance of patient and system characteristics and location of care. *Arch Surg.* 2004;139(1):67-72.

Gupta R, Pyati S. Controversies in office-based anesthesia: obstructive sleep apnea considerations. *Minerva Anestesiol.* 2018;84(9):1102-1107.

Joshi GP, Ankichetty SP, Gan TJ, Chung F. Society for Ambulatory Anesthesia consensus statement on preoperative selection of adult patients with obstructive sleep apnea scheduled for ambulatory surgery. *Anesth Analg.* 2012;115(5):1060-1068.

Practice guidelines for moderate procedural sedation and analgesia 2018: a report by the American Society of Anesthesiologists task force on moderate procedural sedation and analgesia, the American Association of Oral and Maxillofacial Surgeons, American College of Radiology, American Dental Association, American Society of Dentist Anesthesiologists, and Society of Interventional Radiology. *Anesthesiology*. 2018;128(3):437-479.

Whippey A, Kostandoff G, Ma HK, et al. Predictors of unanticipated admission following ambulatory surgery in the pediatric population: a retrospective case–control study. *Paediatr Anaesth*. 2016;26(8):831-837.

Whippey A, Kostandoff G, Paul J, et al. Predictors of unanticipated admission following ambulatory surgery: a retrospective case-control study. *Can J Anaesth*. 2013;60(7):675-683.

## Coding

**Inclusion of a code in this table does not imply reimbursement. Eligibility, benefits, limitations, exclusions, precertification/referral requirements, provider contracts, and Company policies apply.**

**The codes listed below are updated on a regular basis, in accordance with nationally accepted coding guidelines. Therefore, this policy applies to any and all future applicable coding changes, revisions, or updates.**

**In order to ensure optimal reimbursement, all health care services, devices, and pharmaceuticals should be reported using the billing codes and modifiers that most accurately represent the services rendered, unless otherwise directed by the Company.**

**The Coding Table lists any CPT, ICD-10, and HCPCS billing codes related only to the specific policy in which they appear.**

### CPT Procedure Code Number(s)

See Attachment A.

### ICD - 10 Procedure Code Number(s)

N/A

### ICD - 10 Diagnosis Code Number(s)

N/A

### HCPCS Level II Code Number(s)

See Attachment A.

### Revenue Code Number(s)

N/A

## Cross Reference

**Attachment A:** Site of Care for Elective Procedures [Hospital Outpatient Setting to Ambulatory Surgical Center (ASC)]
Description: CPT/HCPCS Codes

## Policy History

**Revisions From MA12.005:**

| | |
|---|---|
| 06/01/2026 | This new policy will become effective 06/01/2026.<br><br>This new policy has been developed to communicate the Company's coverage criteria for certain planned elective medically necessary procedures performed in a hospital outpatient site of care and/or an ambulatory surgical center site of care. |

**Version Effective Date:** 06/01/2026

**Version Issued Date:** 06/01/2026

**Version Reissued Date:** N/A

independence

| Advanced Search

Filed and Attested by the
Office of Judicial Records
22 JUL 2026 04:06 pm
B. BALILONIS

**Commercial**
Medical Policy



## Notification

**Site of Care for Elective Procedures [Hospital Outpatient Setting to Ambulatory Surgical Center (ASC)]**

**Notification Issue Date:** 03/02/2026

This new policy will become effective 06/01/2026.

This new policy has been developed to communicate the Company's coverage criteria for certain planned elective medically necessary procedures performed in a hospital outpatient site of care and/or an ambulatory surgical center site of care.

---

***Note***: On 03/06/2026 this policy in Notification was updated. The code list in Attachment A has been refined to communicate certain planned elective procedures that generally do not support a hospital outpatient admission but may be appropriate for an ambulatory surgical center (ASC). The policy will become effective 06/01/2026.

***Note***: On 03/25/2026, this policy in Notification was updated to reflect additional refinements to the code list in Attachment A. The policy will become effective 06/01/2026.

# Medical Policy Bulletin

Title:

**Site of Care for Elective Procedures [Hospital Outpatient Setting to Ambulatory Surgical Center (ASC)]**

Policy #:

**12.06.00**

**This policy is applicable to the Company's commercial products only. Policies that are applicable to the Company's Medicare Advantage products are accessible via a separate Medicare Advantage policy database.**

**The Company makes decisions on coverage based on Policy Bulletins, benefit plan documents, and the member's medical history and condition. Benefits may vary based on contract, and individual member benefits must be verified. The Company determines medical necessity only if the benefit exists and no contract exclusions are applicable.**

**When services can be administered in various settings, the Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition. This decision is based on the member's current medical condition and any required monitoring or additional services that may coincide with the delivery of this service.**

**This Medical Policy Bulletin document describes the status of medical technology at the time the document was developed. Since that time, new technology may have emerged or new medical literature may have been published. This Medical Policy Bulletin will be reviewed regularly and be updated as scientific and medical literature becomes available. For more information on how Medical Policy Bulletins are developed, go to the Policy Types and Descriptions section of this Medical Policy Web site.**

## Policy

**Coverage is subject to the terms, conditions, and limitations of the member's contract.**

The Company reserves the right to reimburse only those services that are furnished in the most appropriate and cost-effective setting that is appropriate to the member's medical needs and condition.

### POLICY EXCEPTIONS

This policy does not apply to the services listed below:

- Emergency claims
- Pediatric claims (age less than 18 years old)

### MEDICALLY NECESSARY

There are certain planned elective procedures that generally do not support a hospital outpatient admission but may be appropriate for an ambulatory surgical center (ASC) if the anticipated postoperative care requirements can be met in an ASC. When there are multiple options for the site of care, and in the absence of any clinical contraindication, the most appropriate and cost-effective setting with the proper equipment and level of support to perform the service will be approved.

The services included in the coding section of this policy require precertification if they are performed in a hospital outpatient site of service.

Certain planned elective procedures performed in a hospital outpatient department may be considered medically necessary when the individual has one of the following clinical conditions that puts them at an increased risk for complications (this is not an all-inclusive list):

#### Anesthesia Risk

- ASA classification III or higher
- History of complication of anesthesia
- Documentation of alcohol dependence or history of cocaine use
- Prolonged surgery (> 3 hours)

#### Cardiovascular Risk

- Cardiac arrhythmia (symptomatic arrhythmia despite medication)

- Coronary artery disease (CAD)/peripheral vascular disease (PVD) [ongoing cardiac ischemia requiring medical management or recently placed (within 1 year) drug-eluting stent]
- History of cerebrovascular accident (CVA) or transient ischemic attack (TIA) (recent event [< 3 months])
- History of myocardial infarction (MI) (recent event [< 3 months])
- Individuals with drug-eluting stents (DES) placed within 1 year or bare metal stents (BMS) or plain angioplasty within 90 days unless acetylsalicylic acid and antiplatelet drugs will be continued by agreement of surgeon, cardiologist, and anesthesia
- Ongoing evidence of myocardial ischemia
- Resistant hypertension (poorly controlled)
- Severe valvular heart disease
- Uncompensated chronic heart failure (CHF) (NYHA class III or IV)

### Liver Risk

- Advanced liver disease (MELD Score > 8)

### Pulmonary Risk

- Chronic obstructive pulmonary disease (COPD) ($FEV_1$ < 50%)
- Poorly controlled asthma ($FEV_1$ < 80% despite medical management)
- Sleep apnea (moderate to severe obstructive sleep apnea [OSA])

### Metabolic, Hepatic or Renal Risk

- End-stage renal disease (hyperkalemia above reference range) receiving peritoneal or hemodialysis
- Uncontrolled diabetes with recurrent diabetic ketoacidosis (DKA) or severe hypoglycemia within the last 6 months.
- Morbid obesity (BMI greater than or equal to 50)

### Hematologic/Immunologic Risk

- Hereditary bleeding disorder such as factor VIII, IX, or von Willebrand's disease
- The procedure being performed carries a high risk of significant blood loss that requires transfusion.

### Other

- Advance surgical planning determines an individual requires overnight recovery and care following a surgical procedure
- Developmental stage or cognitive status warranting use of a hospital outpatient department
- Pregnancy

## REQUIRED DOCUMENTATION

The individual's medical record must reflect the medical necessity for the care provided. These medical records may include, but are not limited to: records from the professional provider's office, hospital, nursing home, home health agencies, therapies, and test reports.

The Company may conduct reviews and audits of services to our members, regardless of the participation status of the provider. All documentation is to be available to the Company upon request. Failure to produce the requested information may result in a denial for the service.

## Guidelines

BENEFIT APPLICATION

Subject to the terms and conditions of the applicable benefit contract, use of the ambulatory surgical center may be covered under the medical benefits of the Company's products when the medical necessity criteria listed in the medical policy are met.

AMERICAN SOCIETY OF ANESTHESIOLOGISTS (ASA) PHYSICAL STATUS CLASSIFICATION SYSTEM

- ASA I: A normal, healthy individual
- ASA II: An individual with mild systemic disease
- ASA III: An individual with severe systemic disease
- ASA IV: An individual with severe systemic disease that is a constant threat to life
- ASA V: A moribund individual who is not expected to survive without the operation
- ASA VI: A declared brain-dead individual whose organs are being harvested

New York Heart Association (NYHA) Functional Classification

| Class | Patient Symptoms |
|---|---|
| I | No limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation or shortness of breath. |
| II | Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, shortness of breath or chest pain. |
| III | Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, shortness of breath or chest pain. |
| IV | Symptoms of heart failure at rest. Any physical activity causes further discomfort. |

Source- AHA website 2026

## Description

AMBULATORY SURGICAL CENTER

An ambulatory surgery center, or ASC, is a freestanding ambulatory healthcare facility, other than a physician's office, that provides same-day surgical care, including diagnostic and surgical procedures on an ambulatory basis. The surgeries conducted in ASCs are typically less invasive than those conducted in a hospital outpatient setting.

**HOSPITAL OUTPATIENT SETTING**

A hospital outpatient setting is defined as a setting where an individual arrives and is registered at a hospital without the need for an acute inpatient setting to undergo the procedure, and is discharged on the same date of the procedure or within the timeframe for observation. This includes on-campus outpatient and off-campus outpatient setting.

AMERICAN SOCIETY OF ANESTHESIOLOGISTS (ASA) PHYSICAL STATUS CLASSIFICATION SYSTEM

Case ID: 2607026

The American Society of Anesthesiologists (ASA) physical status classification system, and/or significant comorbidities may be taken into account. The ASA risk scoring system is regarded by hospitals, legal firms, accrediting bodies, and other healthcare groups as a preoperative health grading system for individuals undergoing a surgical procedure.

## References

Ambulatory Surgery Center Association (ASC). What is an ASC? [ASCA website] 2025. Available at: https://www.ascassociation.org/asca/about-ascs/surgery-centers. Accessed January 26, 2026.

American Academy of Otolaryngology–Head and Neck Surgery Position Statement: Ambulatory Procedures (2021). Available at: https://www.entnet.org/resource/position-statement-ambulatory-procedures/. Accessed on January 26, 2026.

American College of Surgeons (ACS) National Surgical Quality Improvement Program (NSQIP®). Surgical risk calculator. [ACS Web site]. 06/2023. Available at: https://riskcalculator.facs.org/RiskCalculator/. Accessed January 26, 2026.

American Heart Association (AHA). Classes and stages of heart failure. [AHA Web Site] 2026. Available at: https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure. Accessed January 07, 2026.

American Society of Anesthesiologists (ASA). Statement on ASA physical status classification system. [ASA Web site]. 12/13/2020. Updated 10/15/2025. Available at: https://www.asahq.org/standards-and-practice-parameters/statement-on-asa-physical-status-classification-system. Accessed January 7, 2026.

Chung F, Abdullah HR, Liao P. STOP-Bang questionnaire: a practical approach to screen for obstructive sleep apnea. *Chest.* 2016;149(3):631-638.

Chung F, Subramanyam R, Liao P, et al. High STOP-Bang score indicates a high probability of obstructive sleep apnoea. *Br J Anaesth*. 2012 May;108(5):768-775.

Farney RJ, Walker BS, Farney RM, et al. The STOP-Bang equivalent model and prediction of severity of obstructive sleep apnea: relation to polysomnographic measurements of the apnea/hypopnea index. *J Clin Sleep Med.* 2011;7(5):459B-465B.

Federation of State Medical Boards (FSMB). Report of the special committee on outpatient (office-based) surgery. 2002. Available at: https://www.fsmb.org/siteassets/advocacy/policies/outpatient-office-based-surgery.pdf. Accessed January 26, 2026.

Fleisher LA, Pasternak LR, Herbert R, et al. Inpatient hospital admission and death after outpatient surgery in elderly patients: importance of patient and system characteristics and location of care. *Arch Surg.* 2004;139(1):67-72.

Gupta R, Pyati S. Controversies in office-based anesthesia: obstructive sleep apnea considerations. *Minerva Anestesiol.* 2018;84(9):1102-1107.

Joshi GP, Ankichetty SP, Gan TJ, Chung F. Society for Ambulatory Anesthesia consensus statement on preoperative selection of adult patients with obstructive sleep apnea scheduled for ambulatory surgery. *Anesth Analg.* 2012;115(5):1060-1068.

Practice guidelines for moderate procedural sedation and analgesia 2018: a report by the American Society of Anesthesiologists task force on moderate procedural sedation and analgesia, the American Association of Oral and Maxillofacial Surgeons, American College of Radiology, American Dental Association, American Society of Dentist Anesthesiologists, and Society of Interventional Radiology. *Anesthesiology*. 2018;128(3):437-479.

Whippey A, Kostandoff G, Ma HK, et al. Predictors of unanticipated admission following ambulatory surgery in the pediatric population: a retrospective case–control study. *Paediatr Anaesth*. 2016;26(8):831-837.

Case ID: 2607026

Whippey A, Kostandoff G, Paul J, et al. Predictors of unanticipated admission following ambulatory surgery: a retrospective case-control study. *Can J Anaesth*. 2013;60(7):675-683.

## Coding

**Inclusion of a code in this table does not imply reimbursement. Eligibility, benefits, limitations, exclusions, precertification/referral requirements, provider contracts, and Company policies apply.**

**The codes listed below are updated on a regular basis, in accordance with nationally accepted coding guidelines. Therefore, this policy applies to any and all future applicable coding changes, revisions, or updates.**

**In order to ensure optimal reimbursement, all health care services, devices, and pharmaceuticals should be reported using the billing codes and modifiers that most accurately represent the services rendered, unless otherwise directed by the Company.**

**The Coding Table lists any CPT, ICD-10, and HCPCS billing codes related only to the specific policy in which they appear.**

### CPT Procedure Code Number(s)

See Attachment A.

### ICD - 10 Procedure Code Number(s)

N/A

### ICD - 10 Diagnosis Code Number(s)

N/A

### HCPCS Level II Code Number(s)

See Attachment A.

### Revenue Code Number(s)

N/A

## Cross Reference

**Attachment A:** Site of Care for Elective Procedures [Hospital Outpatient Setting to Ambulatory Surgical Center (ASC)]
Description: CPT/HCPCS Codes

## Policy History

### Revisions From 12.06.00:

| | |
|---|---|
| 06/01/2026 | This new policy will become effective 06/01/2026.<br><br>This new policy has been developed to communicate the Company's coverage criteria for certain planned elective medically necessary procedures performed in a hospital outpatient site of care and/or an ambulatory surgical center site of care. |

**Version Effective Date:** 06/01/2026

**Version Issued Date:** 06/01/2026

**Version Reissued Date:** N/A

Case ID: 260702609